## STATE v. WILLIAM FRIEDMAN AND OTHERS. WILLIAM FRIEDMAN, APPELLANT.[1]

### July 23, 1920.

### No. 21,566.

**Conviction for swindling sustained.**

1. The evidence was sufficient to support the conviction of the defendant of the crime of swindling. It would justify the jury in finding that he was the directing head of a gang of swindlers, two of whom actually perpetrated the crime charged in the indictment, and that defendant, though not present when the crime was committed, was concerned in it and shared in the division of the money obtained from the victim.

**Evidence of similar swindle by defendant admissible.**

2. Applying the rule that proof may be made of a system of cheats or swindles of the same general nature as that with which defendant is charged, it is *held* that the evidence sufficiently connected the defendant with the perpetration of a swindle of the same general nature as the one for which he was being tried and that the state was properly allowed to make proof thereof.

[1] Reported in 178 N. W. 895.

**No error in failure to swear Jewish witnesses according to their faith.**

3. There was neither a showing nor a sufficient offer to show that certain witnesses for the state were of the Jewish faith, and that there was a mode of administering the oath to them according to the ritual of their church, which would be more solemn and obligatory than the usual oath administered to witnesses, and hence the failure to swear such witnesses as provided by section 8379, G. S. 1913, was not reversible error.

**Denial of new trial not erroneous.**

4. The court did not err in denying a motion for a new trial because of newly discovered evidence, where such evidence consisted largely of statements alleged to have been made after the trial by witnesses for the state, which contradicted the testimony they had given or tended to impeach them.

**Argument of prosecutor not prejudicial.**

5. There was nothing in the closing argument of the prosecuting attorney, which was prejudicial to the substantial rights of the defendant, in view of the court's directions to the jury given when its attention was called to the objectionable remarks.

William Friedman, indicted with others by the grand jury of Ramsey county charged with the crime of swindling, was tried separately in the district court for that county before Hanft, J., and a jury which returned a verdict of guilty as charged in the indictment. From an order denying his motion for a new trial, defendant appealed. Affirmed.

*Cary & Lewis,* for appellant.

*Clifford L. Hilton,* Attorney General, *Richard D. O'Brien,* County Attorney, and *R. F. Schroeder,* Assistant County Attorney, for respondent.

LEES, C.

William F. Friedman of St. Paul, his wife, and Jacob Halpern, Morris Gilman and John Berman, were indicted, charged with having obtained $1,000 from one Mirsky by a swindling device. Friedman was tried separately and convicted, and appeals from an order denying a new trial.

His principal contention is that Edward Paul, the chief witness for the state, fabricated the story he related on the witness stand, and that the evidence, as a whole, is insufficient to justify a conviction. Mirsky

was swindled out of $1,000 in February, 1918, by Gilman and Berman. The device used consisted of two short pieces of wood bolted together to form a primitive press, with which Gilman represented he could print bank bills by inserting genuine bills between blank slips of paper saturated with a liquid, placing them in the press and leaving them in it for an hour or two. It was shown that Friedman and another man went to Mirsky's shop and had some bolts threaded up close to the bolt heads, and the state claims that they were the bolts in the contrivance used when Mirsky was swindled. Mirsky drew ten $100 bills from his bank and gave them to Gilman, who professed to put them in the press in the manner outlined, and then went away with Berman, leaving Mirsky to watch the money for the time required to print it. Needless to say, the two never returned and Mirsky found only blank bits of paper in the press. He reported his loss to his brother-in-law, who requested Mrs. Friedman to give them counsel, which she did, advising Mirsky to see a lawyer and tell the police of his loss. He did neither, for the alleged reason that the lost money was the proceeds of a fire insurance policy he had carried on a blacksmith shop recently burned at his instigation, and that he feared arrest for arson if the police began to investigate.

Edward Paul, who was Mirsky's partner, had been convicted of passing counterfeit money and had served out his term of imprisonment. To him Mirsky also confided the tale of his loss. A short time before, Paul had made the acquaintance of Gilman, through whom he became acquainted with Friedman. Gilman had heard of Paul's past record and told him, according to Paul's testimony, that Friedman, too, was a counterfeiter and that he would arrange for a meeting with him. A few days after Mirsky lost his money, Paul claims to have met the Friedmans, the husband on the street and the wife at their house, where he was invited by the husband. He testified that in the course of his visit Mrs. Friedman told him, in her husband's presence, that they had received $246 of Mirsky's money; that they got 10 per cent of the money obtained by their confederates, and that, if he found any one whose money they obtained by swindling devices, they would divide their commission with him. These devices were later described by the Friedmans as the "green goods game" (the device by which Mirsky was swindled), the

"gold brick game," and the "platinum game." Later on, Paul claims to have frequently met several men at Friedmans', all of whom were engaged in swindling, and with whom he and the Friedmans discussed operations which had been or were to be carried out. One of them was Jacob Halpern and another bore the name of Brown.

Paul's story was that after a time he learned that the Friedmans had made Mirsky believe that he (Paul) had his lost money and was Gilman's confederate. Incensed by this, he planned revenge, and, to obtain it, induced one Finkelstine, a friend at Duluth, to impersonate a man of wealth, ready to increase it by dealing in counterfeit money, his object being to trap Friedman and have him punished for his alleged participation in the crime against Mirsky. He told the Friedmans about Finkelstine and arranged for a meeting with him. Friedman went to Duluth with Paul and met Finkelstine. On their return to St. Paul, Brown went to Duluth with Paul to meet Finkelstine and demonstrate to him that the counterfeit money could not be distinguished from genuine money. Paul testified that Friedman sent Brown with him, and that Brown carried a contrivance like that used to swindle Mirsky, and showed how counterfeit bills could apparently be made by following the same course of procedure. In the latter part of June, 1918, Friedman, Paul, Halpern and Brown drove to Duluth in Friedman's automobile. The start was made from his house and a suitcase was part of the baggage carried. A room in a hotel in West Duluth was engaged by Halpern. He and Brown went there, taking the suitcase with them. Friedman remained in his automobile. Paul got Finkelstine and took him to the room, ostensibly to buy counterfeit money. While the four men were in the room something alarmed them and they all ran out, leaving the suitcase. It was later turned over to the police and found to contain packages of blank paper of the size of bank bills, wrapped up in bundles and tied with tape. Halpern was arrested within a day or two and Friedman a little later. Halpern gave bail, but did not appear at the trial.

In March, 1918, a St. Paul tailor named Harris was swindled out of $800 by three men, one of whom he positively identified as Halpern. He at first identified Friedman as another of the trio but when he testified at the trial was not sure of his identity. He was swindled by the

"gold brick game," receiving a small tin box filled with scraps of brass represented to be gold, which he was to hold for a few hours as security for the money he loaned to one of the men, which was to be repaid with a liberal bonus. Mrs. Friedman was arrested immediately after her husband's arrest. When their house was searched, similar boxes and brass clippings were found in the basement.

The state produced telegrams to Friedman, signed "Jacobson," a name assumed by Halpern. One, sent after the Finkelstine project had been launched, read: "Try your party. Shall meet me half way to get the goods as I am very busy. Answer by wire." The state claims that the message referred to the proposed meeting with Finkelstine. Letters and telegrams were produced purporting to come from Finkelstine to Paul, referring to the meeting which later took place. In one of the letters he said that he had $75,000 to invest in counterfeit money, and added: "Bring your men up here and we will do business quick." Paul testified that he showed the letters and telegrams to Friedman and his confederates, and the trip to Duluth followed.

1. The foregoing is but a brief outline of the evidence upon which the state built its theory that the Friedmans were the directing heads of a gang of swindlers who made their headquarters at their house; that Mirsky was the victim of a general scheme of swindling planned and executed by them and their associates in crime; that the scheme to swindle Finkelstine was similar to that by which Mirsky was swindled, and that Paul's story, which directly connects Friedman with the Mirsky swindle, is corroborated in so many particulars as to justify the jury in accepting it as true. We find scattered through the record other evidence to support the state's theory, so that it may fairly be said that, if the jury believed that Paul told the truth, the state was entitled to a conviction. The jury were instructed that the only testimony squarely connecting Friedman with the crime charged was that of the witness Paul and that if they did not believe Paul, they must acquit. In denying the motion for a new trial, the court remarked that the jury was above the average in intelligence, and, after it had sifted the divergent and inconsistent mass of testimony under a charge to which no exception was taken, its conclusion that Paul's story was true and that Friedman was guilty ought not

to be disturbed. We have read and considered the great volume of evidence introduced by the defense. If it is substantially true, there should have been an acquittal. It was eminently for the jury to decide where the truth lay. By their verdict they have indicated that they believed Paul's story. We cannot say that it is so fantastic as to be wholly unworthy of credit, nor would we be justified in overturning the verdict merely because we might doubt the truth of Paul's testimony.

2. The admission of evidence to show the swindle perpetrated on Harris is assigned as error upon the authority of State v. Fitchette, 88 Minn. 145, 92 N. W. 527. The rule which confines the evidence to proof of the specific crime charged and forbids proof of independent crimes, the exceptions to the rule, and the limits upon the application of the exceptions were recently considered and clearly defined. State v. Monroe, 142 Minn. 394, 172 N. W. 313; State v. Whipple, 143 Minn. 403, 173 N. W. 801; State v. Ettenberg, 145 Minn. 39, 176 N. W. 171. We think that the present case is within the exception which admits proof of a system of cheats or swindles of the same general nature, and that proof of the Harris swindle was therefore properly received. It is urged that the proof did not connect Friedman with that swindle. It did connect him with Halpern, one of the perpetrators. The box and brass clippings left with Harris were like those found in Friedman's house, and Paul testified that when at the house Friedman showed him a small box filled with brass, and Mrs. Friedman said a man had paid $800 for a similar box. This, in our opinion, sufficiently connected Friedman with the Harris swindle.

3. The prosecuting attorney, at the close of the trial, inquired whether it would be admitted that Halpern was a fugitive. There was objection to the inquiry and the court instructed the jury to disregard it. In arguing the case, the prosecuting attorney said: "Halpern swindled! Preposterous. If he was, why doesn't he come here and say so? * * * He admits it by his flight." There was an objection on the ground that evidence to prove Halpern's flight had been excluded, and the court said: "That is correct. There is no evidence. Except the one statement that Halpern isn't here, that is proper. The rest of it is improper." We think that the claim of prejudicial error based on this incident in the trial should not be sustained.

4. It is assigned as error that the principal witnesses for the state should have been sworn according to the ritual of the Polish Jewish church and that section 8379, G. S. 1913, applies. When Mirsky was sworn, counsel for the defense asked permission to examine him as to his faith to determine what oath he should take as a witness. The court denied the request, saying: "We went through that matter in the other proceeding and I shall hold that the oath as administered to this man is the proper oath to administer." There was no offer to show that some peculiar mode of swearing Mirsky or the other witnesses would have been more solemn or obligatory than the usual mode, or that there were any peculiar ceremonies for administering oaths recognized by Polish Jews as specially binding upon the conscience. For the reason that we do not have before us anything ·to disclose the showing made in the other proceeding referred to by the court, nor any offer to make such a showing as would make the statute applicable, we hold that this assignment of error is without merit.

5. Harris testified that he saw Halpern and Friedman at the police station after they were arrested, and that he then said that Friedman was the man who brought in the gold. Counsel for the defense asked to have this testimony stricken on the ground that it was an attempt on the part of the state to impeach its own witness. In describing the three men who swindled him, Harris was asked and answered the following questions:

"Q. Do you know this man Friedman?
"A. Well, I can't tell on him.
"Q. Do you know him now?
"A. Yes, this time.
"Q. Does he look like the man that came in?
"A. There is much difference on that. I can't depend on that."

The motion to strike was properly denied. The testimony tended to strengthen the identification of Friedman rather than to impeach Harris.

6. Newly discovered evidence was one of the grounds of the motion for a new trial. It was largely in the nature of impeachment of the principal witnesses for the state by statements they are alleged to have made after the trial. The discovery of such evidence is rarely held to warrant

a new trial. State v. Dumphey, 4 Minn. 340 (438); State v. Sheltrey, 100 Minn. 107, 110 N. W. 353, 10 Ann. Cas. 245; Sivertson v. City of Moorhead, 119 Minn. 467, 138 N. W. 674. The state presented affidavits showing that Mrs. Friedman was active in attempting to induce the state's witnesses to retract their testimony against her husband. In denying the motion for a new trial, the court said that her conduct and that of her friends during the progress of the trial was such that they were warned that it must stop, and that some of the witnesses for the state had asked the court for protection. There is no showing of an abuse of discretion in the denial of a new trial on the ground of newly discovered evidence.

The other assignments of error are without merit and require no discussion. There are many of them. None have been overlooked.

We reach the conclusion that the trial was a fair one and that the conviction should stand. The order denying a new trial is affirmed.

On September 10, 1920, the following opinion was filed:

PER CURIAM.

The petition for a rehearing calls attention to inaccuracies in the statement of facts in the opinion.

The state claimed that the bolts threaded in Mirsky's shop were used in a contrivance similar to that by which he was swindled and not in the identical one described in his testimony.

The trip to Duluth was made by Friedman and Paul after and not before Brown and Paul went there to meet Finkelstine.

These corrections do not change the main facts in the case upon which we held that there was sufficient evidence to support the verdict.

The petition is denied.